1

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF TEXAS**

**TYLER DIVISION**

*FILED*
*U.S. DISTRICT COURT*
*EASTERN DISTRICT OF TEXAS*

*JAN 1 9 2022*

*BY*
*DEPUTY* _____

<u>JAMES FINCH, (pro se)</u>

420 ACR 321, Palestine, TX 74803

**V.**                                          **CASE NO:** 6:22 CV18 -JCB- KNM

<u>THE TEXAS DEPARTMENT OF PUBLIC SAFETY</u>

4700 University Dr, Tyler TX 75707


<u>THE ANDERSON COUNTY, TEXAS SHERIFF'S DEPARTMENT</u>

1200 E. Lacy, Palestine, TX 75801



**TO THE HONORABLE JUDGE OF SAID COURT:**

At this time the Appellee respectfully wishes to challenge the **<u>Texas Code of</u>**
**<u>Criminal Procedure Article 62</u>** ("The Sex Offender Registration Program") in this
court's jurisdiction as unconstitutional under the UNITED STATES CONSTITUTION.
The State does not have the authority to limit the **"Right of Autonomy"** and
**"Liberty interests"** of a single American citizen (the Appellee) to such an
overwhelming degree without the **due process** of law guaranteed to the citizens
of the United States under the **<u>Fourteenth Amendment</u>** of the U.S.
CONSTITUTION, much less the estimated ninety-five thousand American citizens
currently under the onus of the "<u>Texas Sex Offender Registration Act</u>".  It is clearly
in direct contravention, contrary to and/or an unreasonable application of clearly

November 4th, 2021

established federal law as determined by the UNITED STATES SUPREME COURT. See; **Smith v. Doe** (538 U.S. S. Ct. 1140, 155 L. Ed. 2d 164, 2003). It is a violation of a constitutionally protected interest in **"Fundamental liberties"** so profound that it violates "**Substantive Due Process**" on a level that should shock the public conscience. See below (All instances apply to Appellee personally as well as others subject to the onus of this statute):

A. It requires multiple and frequent in person reporting to a degree that it substantially impedes the **"Fundamental right to travel"**, See; Tex. Code Crim. Proc. Art. 051(a)(2), Art. 62.055(a), Art 62.055(1), Art 62.058, and **Shapiro v. Thompson**, (394 U.S. 618, 89 S. Ct. 1322; 22 L. Ed. 2d 600; 1969 U.S. LEXIS 3190), **Kent v. Dulles,** 357 U.S. 116 (1958) also **Smith v. Doe** (538 U.S. S. Ct. 1140, 155 L. Ed. 2d 164, 2003).

   1. Texas Sheriff's departments (and possibly all law enforcement agencies) require any and all reported information to be reported by Appellee and all others *in person* due to the fact that the registrant must sign a form listing any and all changes in information and informing them that submitting false information is a felony (As well as forcing them to sign and acknowledge their Miranda Rights. This is disingenuously referred to as a "Voluntary Statement form").

   2. The Appellee and other registrants are required to report *in person* annually in order to renew their driver's license or face a felony charge. There is no exception for incarceration or incapacitation. Persons not on the registry are not required to renew for up to six years.

November 4th, 2021

3.  Should Appellee or another registrant work in information technology and be required to create new online identifiers frequently this can result in ***perpetual in person reporting***. If the Appellee or any registrant is traveling from state to state on vacation and creates a new online identifier it must be reported ***in person*** within seven days, severely "Chilling" their ability to travel freely.  If he is on vacation in Alaska or Maine and shaves his beard or moustache, he is required to report ***in person*** within seven days to the central registration authority so that a new photograph may be taken.

4.  It even requires Appellee or any other sex offender to appear ***in person*** to report the fact that he has been hospitalized due to illness or injury within seven days and makes no allowance for incapacitation, see; <u>Tex. Code Crim Proc. Art. 62.057(c)(2)</u>.  Appellee or other registrant can literally commit a felony offense which is then enhanced to as high as a first-degree felony (penalty of twenty-five to ninety-nine years), by being in a coma.  See; **<u>Smith v. Doe</u>** (538 U.S. S. Ct. 1140, 155 L. Ed. 2d 164, 2003).

5.  This statute also affects the **"Fundamental right to travel"** due to its effectively amounting to a practical real-world requirement to receive permission from the State prior to a change of residence.  As notification of any change of address must be reported ***in person*** seven days prior to

the actual move.  Tex. Code Crim Proc. Art. 62.051(a)(2) also states "or the first date the local law enforcement authority or the municipality or county by policy **allows the person to register or verify registration**". This gives the local registration authorities the ability to delay the reporting and thus the Appellee or other registrant's ability to change residences until they choose to open the registration office and accept the information.  The Anderson County Sheriff's department Sex Offender Registration office is only open for four hours on the first and fifteenth of each month.  This means if Appellee or other registrant wishes to give seven days' notice on the second or sixteenth of the month, they must wait up to two weeks or more before they can legally be allowed to report and thus move freely. If he moves prior to being allowed to report, they have committed a new felony offense.  Again, they must report *in person*.  It can and frequently does result in registration officers telling "sex offenders", "It's ok.  Just come in the next time we are open".  Forcing registrants to rely upon nothing more than the officer's discretion and whim that they will not be arrested, incarcerated and forced to prove their version of events in court (See attached exhibit).  Often after months or years of pretrial incarceration. The Appellee himself has suffered this exact scenario (See Exhibit P). Again, they face an offence which may be enhanced up to a penalty level of twenty-five to ninety-nine years in prison dependent upon circumstance and their previous criminal history.

B. It impermissibly restricts the **"Fundamental right to lawful free speech"** and the ability to **"Participate in the political process"** in violation of the **First Amendment's** Free Speech Clause, which is applicable to the citizens of Texas under the Due Process Clause of the **Fourteenth Amendment**. This is a "Substantive Due Process violation". See; **Packingham v. North Carolina**, (137 S. Ct. 1730, 198 L. Ed. 2d 273, 2017). See below:

1. It effectively burdens substantially more lawful free speech than is necessary to further any claimed legitimate government interest. It not only allows any and all social media sites to request information on Appellee and others upon the sex offender registry but specifically allows them to be barred from the sites for life and grants the social media site immunity from civil action on the part of the registered person for any such barring. The statute as written enacts a prohibition upon **First Amendment** free speech equivalent to an outright, real world "De facto Ban" to those convicted of a specific class of crime without regard to any claim of "dangerousness" or even history of utilization of the internet in a crime. It is unprecedented in the scope of free speech it burdens and outright prohibits. See Exhibit K.

2. It is arbitrary and burdens Appellee and all registered individuals by preventing an enormous range of communication and expressive activity which is utterly unrelated to any claimed goal. It is a violation of the **First Amendment** and free speech which should shock the public conscience. It

prevents Appellee and others on the registry from seeking work or advertising for needed workers on such sites as "LinkedIn". It bars registrants from discussing politics and religion on sites such as "Facebook". It prevents Appellee and other registrants the easy and direct access to their elected representatives available on "Twitter". It even allows the site "Amazon.com" to bar Appellee and other registrants due to the fact that Amazon meets all the required definitions of a "commercial social networking website". The consequences of such a ban from Amazon and what it could mean to those under quarantine, unable to shop in person is truly frightening. See exhibit K (Facebook's policy on sex offenders).

C. The statute utterly crushes the **"Fundamental right of freedom from incarceration"** due to the following reasons:

1. Appellee himself was arrested and incarcerated as a "Pre-trial detainee" in solitary confinement for over twenty-six months under a warrant issued to "Failing to comply with sex offender registration requirements" awaiting trial on a prohibitively high bond ($300,000). An offense which no citizen of the united states can legally be arrested for unless they are required to register as a "Sex offender". On August 3rd, 2018 at approximately 04:00 a.m. under cover of state law, Texas Department of Public safety state troopers forcibly entered the Appellee's residence by shattering his door and seized his person and personal property by means of a warrant issued under Texas C.C.P. Art. 18.02 (a) (10) which listed no probably cause as clearly and specifically required by the State statute under which it was

November 4th, 2021

issued, Texas C.C.P. 18.01 (c) and the FOURTH AMENDMENT of the UNITED STATES CONSTITUTION.  This was clearly in direct contravention, contrary to and/or an unreasonable application of clearly established Federal Law as determined by the UNITED STATES SUPREME COURT.  Used in this operation there was:  Approximately 20 state troopers in fully body armor armed with AR-15's, an armored personnel carrier and a DPS helicopter.  When Appellee asked why he was under arrest the state trooper replied, "You failed to report three social media accounts".  There was no other allegation of wrongdoing.  The state then violated the Appellee's right to "Due process" by inflicting upon him over twenty-six months of punishing and psychologically torturous pretrial "Medical Isolation" (i.e. Solitary confinement), prior to any criminal conviction for no legitimate governmental goal.  There was no notice, or reason given for the solitary confinement for over a year (at which time the jail claimed it was because Appellee required a CPAP machine).  There was no means of ever remedying the condition, such as earning his way out by good behavior (The Appellee was a model detainee the entire twenty-six months).  It was in all way's indefinite confinement to solitary.  In doing this the state deprived the Appellee of a right to "Due process" under the FIFTH, SIXTH AND FOURTEENTH AMENDMENTS of the UNITED STATES CONSTITUTION by depriving him of a "Liberty interest" by placing him in solitary for twenty-six months and causing him to suffer atypical and significant hardships in relation to the ordinary incidents of jail life.  The agents of the state, including but not limited to the arresting officers and jail officials acted with either deliberate indifference or a state of mind equivalent to gross

negligence or reckless disregard of known risk of harm, which resulted in the Appellee suffering a deprivation of the minimal civilized measures of life's necessities of medical (Psychiatric) care and personal safety due to the solitary confinement posing a substantial risk of self-harm due to Appellee's clearly documented history of Major Depressive Disorder, PTSD, alcoholism and previous suicide attempt "by cop" at that same county.  All of these inflicted prior to any conviction.  Appellee's bond was THREE HUNDERED THOUSAND DOLLARS.  In addition to the Appellee's own personal experience others on the registry face similar scenarios on a near daily basis.

2. Texas already possesses a "Habitual Felon" penalty enhancement scheme which is already used to further punish the Appellee and other registrants in conjunction with the Sex Offender Registration Law's own penalty enhancement scheme.  The Sex Offender Registration law is "Stackable" with the current felony punishment system.  Under Texas law, in conjunction with the Sex Offender Registration Statue it is quite possible, depending upon a registrant's previous criminal history to receive a punishment of twenty-five to ninety-nine years for such offenses as; (1) giving six days and twenty-three hours' notice prior to a change of address, (2) failing to report admission to a hospital due to a stroke or coma (still ongoing) within seven days, (3) being thirty-one days late (one day later than allowed) renewing one's driver's license or state identification, (4) growing or shaving facial hair, among multiple other ridiculously minor

offenses.  "Sex offenders" in Texas can and do receive such sentences every day.

D.  The statute is **unnecessary and redundant** to any claimed governmental purpose of discouraging recidivism or protecting the public. It is also clearly a "Criminal process" rather than a "Civil and Regulatory" process.  See below:

1.  Texas already possesses a "Habitual Felon" penalty enhancement scheme which not only performs the function of discouraging sex offender recidivism and protecting the public but is actually used to further punish sex offenders in <u>conjunction</u> with the Sex Offender Registration Law.  The Sex Offender Registration law also currently includes a penalty enhancement scheme for violations which is "Stackable" with the current felony punishment system.  Appellee and other registrants may be convicted of a single "sex offence", successfully discharge his sentence, commit no further offenses for decades and then give only six days' notice prior to a change of address (Due to the office not being open) and be convicted and sentenced to twenty-five years to life in a maximum-security prison for a "Third degree felony enhanced to a first degree due to a previous felony convictions".  It is a frequent occurrence in Texas.  In some cases, being used to enhance a simple third-degree felony registration charge as high as a first-degree felony which carries a penalty range of twenty-five to ninety-nine years.  And sex offenders in Texas are receiving such punishments regularly.  See; <u>Tex. Code Crim. Proc. Art. 62.102</u>.

November 4th, 2021

2. The <u>Texas Health and Safety Code</u> also already contains a provision allowing for the civil committal of those sex offenders judged dangerous to society and in particular children.  This process not only already effectively performs a "Civil and regulatory" function but is actually used in conjunction with the Sex Offender Registration Law.  See; <u>Texas Health and Safety Code, Title II: Civil Committal of Sexually Violent Predators, Chapter 841</u> (Exhibit A).  It's provisions and requirements are in many ways far more narrowly focused and effective than the Texas Sex Offender Registration Act.  See Exhibit A.

E.  The Statute is clearly punitive and arbitrary as perceived by the Appellee and those others suffering under its onus, in many cases for life.  See below:

1. It is often used as sole justification for county and/or city ordinances that prohibit all registrants from living within a certain distance from churches, schools, daycares or other places children congregate without regard to dangerousness to children.  In Anderson County Texas this is 2000 feet.  Due to the fact that Appellee and other registrants are not allowed to live within 2000 feet of a school, church or daycare they are effectively outlawed from living within small towns such as Palestine Texas.

2. Persons on the Texas Sex Offender Registry are barred from holding a significant number of state licenses effectively resulting in occupational

disbarment.  The Appellee himself is prohibited from attaining a license to work with other registrants in counselling capacity.

3.  It imposes all the above restrictions on the Appellee and other persons who have already paid societies required costs for their crimes and who are no longer subject to any oversight or supervision by the criminal justice system.  The conviction itself, standing alone is all that is required for the burden imposed by this statute.  As these restrictions and reporting obligations are imposed upon registrants and no one else clearly shows that they are a part of their punishment.

4.  It is too easily "Weaponized" against those upon the registry.  It is in every day practical terms utilized to harass and imprison those law enforcement agencies wish incarcerated for reasons such as "They didn't get enough time".  It is, in effect an "End run around".  Despite the courts "Turning of a blind eye" it is in a practical, everyday way a "second bite at the apple" for law enforcement.  The Appellee himself has experienced this very scenario.

5.  Not only are the prohibitions imposed upon the Appellee and those others subjected to the statute "Parallel to probation or supervised release", but they also actually exceed them in virtually every requirement. The formal attributes of the legislature's enactment of this statute, such as its codification, enforcement procedures and "Stacked enhancement" scheme clearly reveal its punitive intent.

November 4th, 2021

6. The statute is arbitrary and uses nothing more than past crime as it's requirement, becoming so sweeping that a huge number of people who pose no real threat to society are crushed beneath its onus (See Exhibit I). What began as a simple "Registration plan" has spiraled into an all-encompassing "Orwellian nightmare".  There can be no doubt that the severe limitations imposed upon Appellee and an estimated ninety-five thousand American Citizens (In Texas alone) based not upon "Current dangerousness" but rather past crime alone constitutes a massive violation of the **"Liberty interests"** protected under the **"Substantive Due Process"** clause of the **Fourteenth Amendment** of the **U.S. Constitution.**

7. The restraints upon the liberty of Appellee as well as some ninety-five thousand American citizens (In the state of Texas alone) are not "Minor and indirect".  They are and certainly feel extremely severe and restraining to Appellee and those others it is imposed upon.  **The Appellee himself was ruled "Unsafe" to be alone with his own grandchild solely due to his being upon the sex offender registry** (See Exhibit B).  He is barred from attending his grandsons' school and sporting events by the schools themselves, solely for being upon the registry.   The Appellee has never had an offense against a child or been judged to be a danger to children in any way.  He is the lowest possible "Risk level" possible on the Texas registry.  See Exhibit D.

F.  It is based upon a hysterical and unfounded public myth that "Sex offenders
    reoffend more than other classes of criminals" (See Exhibit H) and thus pose a
    "Shockingly high-risk level" which the courts themselves have actively
    participated in spreading.  In addition, its effectiveness is not only completely
    and utterly unproven, but it is impossible to prove any positive effect
    whatsoever.  See Exhibits E and G; and below:

1.  Previous court and legislature justifications that Appellee and other
    registrants pose a risk of recidivism higher than other classes of convicted
    felons have been proven erroneous.  What is perhaps the most sweeping
    study thus far conducted by the U.S. Justice Department (**A Multi-state
    Recidivism Study Using Static-99R and Static-2002 Risk Scores and Tier
    Guidelines from the Adam Walsh Act** (See Exhibit C), Research report
    submitted to the National Institute of Justice 2012, Award Number 2008-
    MU-Mu-000) found a recidivism rate of approximately 3.5 percent. In one
    state it was found to be as low as 1.7 percent (Nebraska).  Significantly
    lower than most other violent crimes (Robbery, Burglary and Property
    damage recidivism have been estimated as high as 65 percent in some
    cases; see Exhibit H).  Thus far courts, up to and including the UNITED
    STATES SUPREME COURT have not only refused to perform an in-depth
    empirical review of these assumptions but have actively contributed to it
    (In one case citing a recidivism rate of 80 percent based upon nothing more
    than an ad for sex offender counselling in Psychology Today) See; **Smith v.
    Doe** (538 U.S. S. Ct. 1140, 155 L. Ed. 2d 164, 2003).  In order to remove and
    restrain the liberty of the Appellee as well as ninety-five thousand

American citizens in Texas (810,000 nationwide) Appellee asserts that the burden of proving such a widespread and inclusive assumption should fall upon the State. The Appellee respectfully requests that the court examine this issue in depth and empirically at this time.  Also see Exhibits.

2.  The assumption that this statute "Helps protect the public, especially children" from the Appellee is exactly that.  An unproven, even unexamined assumption without any positive empirical evidence.  Yet this statute is allowed to negatively impact the freedoms of the Appellee as well as ninety-five thousand American citizens in the state of Texas alone (According to the National Center for Missing or Exploited Children, as of 2016 there were 859,500 registered "sex offenders" in United States). In fact, many studies have shown that they actually have a detrimental effect due to the "Placebo effect".  The public often feels a false sense of security due to such laws which has a negative impact on overall public safety and they have been proven to engender a sense of hopelessness and futility in registrants that actually contributes to recidivism.  Additionally, law enforcement resources are stretched beyond the point of effectiveness when they could be rendered far more effective by simply focusing upon those who actively pose a current and continuing threat to the public.  This assumption is allowed to persist in large part because a person labelled "Sex offender" is viewed in the public perception as so reprehensible and irredeemable that no one cares if they are treated as "Second class citizens".  Not even the courts.  Appellee challenges the State to show that

this statute has in ANY empirical, statistical way has actually contributed to the public safety.

G. As written, as well as in all practical real-world applications this law has created a new "**Discrete and insular minority**" which meets all the criteria of a "**Suspect class**" and assigned Appellee and others to it, for the following reasons: See Exhibit J and below:

1. The **"Suspect class"** (Appellee and others on "Sex offender registries") have historically (Since the first registration law's existence) been discriminated against and have been subject to prejudice, hostility, great stigma, assaulted and even hunted and murdered like animals.  Due, largely, to stereotypes.  When Americans hear "registered sex offender" what they immediately assume is "Predatory, repeat child rapist" regardless of the registrant's initial offense, see Exhibit F.  Living restrictions often force registrants to cohabitate with other registrants, perforce in low-income areas (i.e., "Sex offender ghettos").  It frequently leaves them homeless. Employment opportunities are often so negatively impacted that registrants with master's degrees can only find employment in low paying, menial, manual labor jobs.  Appellee himself has been unable to find any employment since his release from prison and has been turned down for over fifty jobs in five years solely due to being on the registry.  It also places Appellee and others in direct danger of injury or death.  Included here are a small sample of persons assaulted or hunted down and murdered simply for being on the registry (Source:  **Vigilantes Assault, Rob and Murder**

**Registered Sex Offenders**, (Loaded on MAY 5, 2017 by <u>Matthew Clarke</u> published in Prison Legal News <u>May, 2017</u>, page 30, Filed under: <u>Sex Offender Registration</u>, <u>Sex Offenders (Discrimination)</u>. Location: <u>United States of America</u> (See Exhibit D, N and O);

a. Between April 12th and April 25th, 2003, Lawrence Trant, Jr., 56, tried to kill 8 registered sex offenders in Concord, New Hampshire. Trant set fire to a boarding house, to an apartment building and ultimately stabbed one man in the street. All the victim's names and addresses were easily obtained by Trant through New Hampshire's sex offender registration program posted on the internet.

b. Two registered sex offenders who were living in the same home in Bellingham, Washington were murdered in 2005 by a man who gained access to their residence by claiming to be an FBI agent investigating threats made against sex offenders. Hank Eisses, 49, and Victor Vasquez, 68, were gunned down by Michael Anthony Mullen, who later confessed to the crime.

c. Stephen A. Marshall, 20, a Canadian citizen, used information from online registries to locate two sex offenders in Maine, killing them in separate incidents in April 2006. William Elliot, 24, and Joseph Gray, 57, were shot to death.  Following the murders, Maine officials stated they did not intend to make any changes to the state's sex offender registry.

d. In August 2011, John Joseph Huffmaster, 29, of Hazelwood, Missouri, was charged with assaulting his 74-year-old neighbor with a hammer because the neighbor was on a sex offender registry. Huffmaster, who

entered the victim's home by asking for a cup of sugar, called police after the attack to claim he was "doing God's work." Police found the victim, semi-conscious and bleeding, with multiple skull and facial fractures.

e. Patrick Drum killed two registered sex offenders in Washington state in 2012. His victims were Gary Lee Blanton, 28, and Jerry Wayne Ray, 57, who were fatally shot in June 2012. Drum reportedly admitted that he was targeting sex offenders and planned to continue killing them until he was caught.

f. On July 21, 2013, Jeremy and Christine Moody, husband and wife, murdered Charles "Butch" Parker, 59, and Gretchen Parker, 51, in South Carolina. Charles was a registered sex offender; both he and Gretchen had been shot and stabbed multiple times. The Moody's were identified from the Parkers' home surveillance video. The video recorded Jeremy Moody telling Charles, "I'm not here to rob you. I'm here to kill you because you're a child molester." Christine Moody told TV reporters that Charles Parker was a "pedophile" and a "demon." Jeremy Moody confessed to deputies that he had killed Charles because he was a registered sex offender, and murdered Gretchen because she lived with him. He admitted to targeting other registered sex offenders and said he would have killed another on his "hit list" a few days later had he not been arrested.

g. In July 2015, Nebraska registered sex offender Phillip McDaniel lost his appeal seeking workers compensation for an attack that had occurred

two years earlier at the Western Sugar Cooperative, when a co-worker assaulted him with a brass hammer while calling him a "chimo" – slang for "child molester."  The co-worker, Jason Bates, had become enraged after discovering that McDaniel was a registered sex offender. McDaniel suffered injuries to his nose, clavicle and left shoulder. He applied for workers compensation but was denied; after he appealed, the Nebraska Court of Appeals upheld the denial, finding that the attack was due to personal reasons even if the only relationship between the two was as co-workers.

h. On June 25, 2016, Anchorage, Alaska police arrested Jason Vukovich, 41, for assaulting three registered sex offenders. The first victim, Charles Albee, told police a man with "shoulder-length hair and a black leather jacket" broke into his apartment, assaulted him and robbed him. The man knew his name and told him he was there because Albee was on the registry. He also showed Albee a notebook with a list of additional potential victims.  Two days later, a man matching the same description and carrying a hammer attacked registered sex offender Andres Barbosa. Barbosa said two women accompanied the man, who said he was there because of Barbosa's "past crimes."  Then on June 29, 2016, Wesley Demarest and Stanley Brown reported a man had broken into their home and attacked Demarest with a hammer, severely injuring him.  Vukovich was arrested after a traffic stop near the last crime scene. Police discovered a notebook with other victims' names and items stolen from their homes in his car.  The details of the assault on Demarest are chilling. At one o'clock in the morning, Brown awakened

to the sound of glass shattering in the entryway of his home. He ran to Demarest's room to tell him someone was breaking in, but Vukovich was right behind him. Vukovich told Demarest to confirm his name and that he was a registered sex offender – for a crime for which he had served nine months, ten years earlier.  "He told me to lay down on my bed and I said 'no.' He said, 'get on your knees' and I said 'no.' He said, 'I am an avenging angel, I'm going to mete out justice for the people you hurt,'" Demarest stated.  Then Vukovich hit him in the head with the hammer four or five times before Demarest lost consciousness. Vukovich fled and Brown called 911. Weeks later, Demarest was still recovering from a fractured skull and unable to return to work.

i.  A Florida man was arrested after he was accused of trying to burn down a motel where several sex offenders were staying.  Jorge Porto-Sierra, 50, confessed to police that he had planned on setting the Friendly Village Inn in Kissimmee on fire to 'barbecue all the child molesters' inside. Porto-Sierra went to the motel on March 7th, 2018, and started screaming 'I'm going to kill you, child molester' as he threw gasoline on the door, according to witnesses.  Police said he then broke the window of the motel room so he could pour gasoline inside. He also threw gasoline on a nearby car. Porto-Sierra was carrying a cigarette the entire time.  At least two of the four people he was targeting are convicted sex offenders, according to WESH 2 News.  When officers asked Porto-Sierra why he hadn't acted on his threats, he told them: 'You got here too soon.'

2. The group possesses an immutable and thanks to the registry itself, a highly visible trait.  With the proliferation of social media, Appellee and other registrants may now literally be hounded and hunted worldwide.

3. Appellee and others in the group are powerless to protect themselves via the political process. The group is a **"discrete"** and **"insular"** minority and thus powerless before the hysteria driven majoritarian will and a law clearly designed to punish a politically unpopular group.

4. The Appellee and group's distinguishing characteristic do not inhibit them from contributing meaningfully to society in spite of the increased difficulties presented by the law itself.

H. The statute violates the **Equal Protection** clause of the FOURTEENTH AMENDMENT of the UNITED STATES CONSTITUTION (See: **Conn. Dep't of Pub Safety v. Doe**, 538 U.S. 1; 123 S. Ct. 1160, 155 L. Ed. 2d 98) also **Smith v. Doe** (538 U.S. S. Ct. 1140, 155 L. Ed. 2d 164, 2003);  in that:

1. It allows only certain people, of which the Appellee is not one, the possibility of avoiding the registration and reporting obligations of the statute, see; <u>Tex. Code Crim. Proc. Art. 62.402(b) and 62.404</u>.  The duration of the reporting requirement is not based upon any registrants' risk of

recidivism but rather to the fact that the Appellee's conviction qualified as "Aggravated".

2. It makes no provision for either rehabilitation or earning one's redemption. Nothing can shorten the registration period.  Not even overwhelming proof of rehabilitation or physical incapacitation.  No matter if the Appellee be rendered a quadriplegic with little to no brain function, he will be required to register for life. The legislator's decision to make courts responsible for granting exemptions belies any argument that the State courts are unequipped to separate offenders who warrant special registration requirements from those who do not.

3. By "drawing a line" and allowing only certain persons on the registry the possibility of avoiding the registry's onerous requirements the State of Texas has arbitrarily decided that only some people are worthy of redemption and thus able to seek discretionary relief from the courts. The Appellee is denied this opportunity.

The statute is shockingly overbroad, affecting the **fundamental freedoms** not only of the Appellee but of an estimated 95,000 American citizens in the State of Texas (859,500 nationwide).  It has been found to be, by all empirical studies not only ineffective but in many cases to contribute to recidivism while providing no proven protection.  It is nothing more than a "Majoritarian" policy which has been enacted based upon nothing more than a "national hysteria" and unfounded, if not outright false claims of "Shockingly high recidivism rates".  It

November 4th, 2021

clearly not only impedes but crushes the **fundamental freedoms** covered under **substantive due process** and exceeds the limits of governmental authority.

As evidenced by the above points this statute is clearly in direct contravention, contrary to and/or an unreasonable application of clearly established federal law as determined by the UNITED STATES SUPREME COURT in multiple rulings. The scope of this act notably exceeds any governmental claim or evidence that it protects the public from Appellee or indeed that he poses any threat to anyone whatsoever.  It applies to Appellee and all ***ninety-five thousand*** registrants in Texas without even attempting to ascertain their "future dangerousness" even though such offense-based registries are proven less effective than those based upon risk assessment.  In fact, it has been found that many if not all the statistics used to justify the "Dangerousness of registrants" as a group are empirically unfounded, see Exhibits L and M.  This is when the courts or State have even bothered to attempt such a justification.  This statute is shockingly overbroad and unreasonable considering any claimed non-punitive government objective.  A government claim not only false but even unexamined. The statute itself as well as others enacted nationwide effectively create a new "**Suspect class**" of which the Appellee is now a member.  A "**discrete and insular minority**" which faces discrimination, state created disabilities affecting living and employment opportunities.  One which has suffered violence and persecution just as any previously existing minority has and just as unable to pass laws to protect itself due to its limited numbers.  A minority stigmatized and saddled with disabilities, subjected to purposeful mistreatment and political powerlessness.  A minority whose members have been documented to have suffered assaults and even been hunted like animals and murdered simply because they were a

member of said minority.  This law has even resulted in the deaths of innocent third-party spouses and bystanders.  A minority numbering an estimated 95,000 American citizens in Texas and almost a million in the United States as a whole. The number of this minority in Texas alone outnumbers the LGBTQ minority members in Idaho, Montana and Wyoming combined.  In the United States in total this minority has a greater population than each of the states of Delaware, South Dakota, North Dakota, Alaska, Vermont, Wyoming and the District of Columbia.  This law has created this new "**Discrete and insular minority**" and named the Appellee as one of its members.  Appellee states that he and other members of this minority are in as dire need of extraordinary protection from the majoritarian political process as any that has ever existed.  "The framers of the Constitution knew, and we should not forget today, that there is no more effective practical guaranty against arbitrary and unreasonable government than to require that the principles of law which officials would impose upon a minority be imposed generally. Conversely, nothing opens the door to arbitrary action so effectively as to allow those officials to pick and choose only a few to whom they will apply legislation and thus to escape the political retribution that might be visited upon them if larger numbers were affected."  **Railway Express Agency, Inc. v. New York,** 336 U.S. 106, 112—113(1949).

Appellee respectfully requests that the court find the majority's hysterical, unfounded, ineffective and discriminatory enactment of this statute unconstitutional and thus not a valid law and so that it cannot be enforced as such, without regard to whether the processes of enactment were actually fair.

November 4th, 2021

The Appellee also respectfully requests that the "Strict Scrutiny" standard be applied for the following reasons; (1) Multiple protected liberty interests are at stake, (2) the protected liberties involved are fundamental in nature, (3) the statute in question creates an undue burden upon the Appellee and all those under its onus, (4) the statute does not in any proven effective way further a compelling government interest, (5) it is far more restrictive, overly broad and inclusively punishing than necessary for any such claimed government objective, (6) it places Appellee and others both on the registry and not, in direct physical danger, (7) An alternative civil process which already accomplishes the "Claimed governmental objective" is already in effect, (8) it is clearly born of a desire to harm a politically unpopular group.  As stated in **Romer v. Evans**, 517 U.S. 620 (1996) "[I]f the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare ... desire to harm a politically unpopular group cannot constitute a *legitimate* governmental interest."

 Appellee also asks that the court examine the law's harshness in proportion to not only it's claimed governmental objective but it's practical real-world lack of effectiveness, the crushing onus felt by those beneath its yoke and the erroneous assumptions it is based upon regarding risk of recidivism and effectiveness.  Appellee also respectfully asks that the court hear this case regardless of any objections of the State's Attorney and that the case be expedited due to the seriousness of its nature and the continuing threat to his life and the lives of those around him.

Appellee has a previous civil rights lawsuit in this same court (6:20cv136) which while prompted by the same arrest is a separate issue.  That complaint is in reference to malicious acts committed by the parties named outside of the lawful

performance of their duties.  This complaint is a challenge to the listed statute independent of the previously filed suit.

Respectfully submitted,

James Finch

420 ACR 321

Palestine, Texas 75803

903 731 3451

Whoisjamesdean950@gmail.com

_____ EXHIBITS ATTACHED

November 4th, 2021